# UNITED STATES DISTRICT COURT

### for the
Eastern District of Virginia



| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>220 Century Place, Apartment 3208, Alexandria, Virginia<br>22304, which is an apartment located in a red brick and<br>gray siding with white trim multi-level apartment building at<br>"The Point" apartment complex | )<br>)<br>)<br>)<br>)<br>)<br>)    Case No.1:17sw262 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____Eastern_____ District of _____Virginia_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 924(c) | Carry and Use of a firearm during a drug trafficking crime. |
| 21 U.S.C. § § 841(a)(1) , 846 | Conspiracy to distribute marijuana, a Schedule I controlled substance. |

The application is based on these facts:
See attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
  under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Reviewed by AUSA/SAUSA:

AUSA Carina A. Cuellar

_____
*Applicant's signature*

Jonathan F. Earle, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/18/2017_____

_____/s/ _____
John F. Anderson
United States Magistrate Judge
*Judge's signature*

City and state: Alexandria, VA

The Hon. John F. Anderson, US Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

IN THE MATTER OF THE SEARCH OF:

**220 Century Place, Apartment 3208, Alexandria, Virginia 22304, which is an apartment located in a red brick and gray siding with white trim multi-level apartment building at "The Point" apartment complex**

Case No. 1:17-sw-262

MAY 1 8 2017

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Jonathan F. Earle, being duly sworn, depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as 220 Century Place, Apartment 3208, Alexandria, Virginia 22304, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.  As further explained herein, BRYAN JAMAL MATTHEWS has conspired to distribute controlled substances and used and carried a firearm during and in relation to a drug trafficking crime, within the Eastern District of Virginia and elsewhere.  Further, MATTHEWS uses the PREMISES to both store and distribute controlled substances.

2.      I have been a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for approximately eight years.  Since March 2013, I have been assigned to the Washington Field Division's Firearms Trafficking Group.  My assignments include

investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics trafficking.

3.      During my time as an ATF special agent, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking. During the course of my participation in investigations of narcotics trafficking organizations, I have testified in trial, Grand Jury proceedings, and at probable cause and detention hearings. I have gained knowledge in the use of various investigative techniques including the use of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

4.      Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating party's cellular telephones or other devices. It is also commonly understood and known that many people in our society communicate with their cellular telephones and other devices in both manners.

5.      Based on my training and experience, I also know that information gained through the obtaining of data stored in the part of the cellular telephone and other devices routinely referred to as an address book or contacts file in an individual's cellular telephone and other devices, as well as the recovery of text messages sent or received from that cellular

2

telephone and other devices can lead to identifying accomplices, or witnesses to the crimes committed by the individual.  Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or smart phones.

6.      Further, based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences and on their property additional quantities of the illicit drugs being distributed.  These drugs may be concealed in locations known to the traffickers to avoid law enforcement detection.  Drug traffickers also commonly maintain at their residences and on their property paraphernalia for packaging, processing, diluting, weighing and distributing controlled substances.

7.      Based on my training and experience in executing court-authorized search warrants, I also know that drug traffickers commonly maintain at their residences money ledgers and other documents, which note the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or when money was possessed or transferred.

8.      The facts and information contained in this affidavit are based upon my personal knowledge of the investigation and observations of other law enforcement officers involved in this investigation.  All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation.

9.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

3

## PROBABLE CAUSE

A.    Possession of a Firearm and Controlled Substances by Bryan Jamal Matthews

10.    On February 8, 2017, personnel with the Fairfax County Police Department ("FCPD") conducted a controlled purchase of marijuana, which is a Schedule I controlled substance, from MATTHEWS.  During this controlled purchase, a FCPD officer serving as an undercover officer ("UC") purchased the marijuana from MATTHEWS.

11.    On February 8, 2017, a cooperating informant ("CI-1"), at the direction of law enforcement, contacted MATTHEWS via text message to arrange the purchase of marijuana. MATTHEWS agreed to meet the CI at a Taco Bell located in the area of Kingstowne, Alexandria, Fairfax County, which is located within the Eastern District of Virginia.

12.    While inside Taco Bell, CI-1 received a phone call from the MATTHEWS. MATTHEWS stated he was near the Papa Johns.  MATTHEWS agreed to walk to the Taco Bell. A few minutes later, MATTHEWS again called CI-1.  The UC looked out the front door of Taco Bell and observed an African American male (MATTHEWS) and an African American female ("Co-Conspirator 1") standing on the sidewalk.  MATTHEWS had his hand raised and was looking at the UC and CI-1, who were then in Taco Bell.  The UC and CI-1 exited the Taco Bell and met MATTHEWS on the sidewalk.  At that time, Co-Conspirator 1 walked to Ledos Pizza, which is located next to the Taco Bell.

13.    Upon meeting, MATTHEWS stated he was just dropped off and would like a ride back.  The UC asked if MATTHEWS could get this done quickly and MATTHEWS agreed. The UC directed MATTHEWS to a vehicle, which was parked in the Taco Bell parking lot.

14.    MATTHEWS entered the rear passenger seat of the vehicle.  MATTHEWS then

4

handed the UC a white plastic grocery bag, which contained a plastic bag of suspected marijuana. MATTHEWS stated it would weigh in at thirty-one (31) grams. In return, the UC handed $270 in U.S. currency to MATTHEWS. An arrest signal was given and FCPD Detectives deployed on the vehicle to arrest MATTHEWS; however, MATTHEWS fled the vehicle on foot. After a brief foot pursuit, law enforcement arrested MATTHEWS.

15.     During a search incident to arrest, law enforcement seized a loaded Glock 27 .40 caliber pistol from MATTHEWS. MATTHEWS was also in possession of a high capacity magazine, which was loaded with 21 rounds of ammunition, approximately one hundred (100) Xanax pills, which is a Schedule IV controlled substance, and $1,264 in U.S. currency. The Xanax pills were packaged in small bags containing two to four pills. The suspected marijuana was seized by FCPD Detectives and field-tested positive for marijuana.

16.     After being taken to a nearby police station and after being read his *Miranda* rights and waiving those rights, law enforcement interviewed MATTHEWS. During the interview, MATTHEWS admitted to selling narcotics and being in possession of the Xanax pills and the Glock 27 .40 caliber pistol seized from his person.

17.     MATTHEWS was arrested for carrying a concealed weapon, carrying a firearm while in possession of schedule I/II controlled substance, and felony possession with intent to distribute marijuana and a schedule IV controlled substance.

18.     Based on my training and experience, I know that a Glock 27 .40 caliber pistol constitutes a firearm pursuant to Title 18, United States Code, Section 921(a)(3).

19.     FCPD personnel also arrested Co-Conspirator 1. During a search incident to arrest, law enforcement seized a loaded Colt .45 caliber pistol and a loaded extended magazine

from Co-Conspirator 1's purse.

20.     After being taken to a nearby police station and after being read her *Miranda*
rights and waiving those rights, law enforcement interviewed Co-Conspirator 1.  During the
interview, Co-Conspirator 1 denied knowledge of the drug transaction.  Co-Conspirator 1 also
denied knowing how a firearm was placed in her purse.  Nevertheless, despite law enforcement
not describing or showing Co-Conspirator 1 the specific firearm found in her purse, Co-
Conspirator 1 described in detail the firearm seized from her purse.  Co-Conspirator 1 also stated
that her fingerprints would be found on the firearm because she had handled the firearm on
previous occasions.

21.     Co-Conspirator 1 was also arrested for carrying a concealed weapon, carrying a
firearm while in possession of schedule I/II controlled substance, and felony possession with
intent to distribute marijuana.

B.     Matthews' Historical Cell Site Records Indicate that his known Cellular Phone
       was Present at a Shooting Incident on March 7, 2017

22.     Further, law enforcement have reviewed MATTHEWS' call records, including
historical cell site information for his known cellular phone for the time period from March 4 and
May 4, 2017.  I know this to be MATTHEWS' phone number because the CI used this number
to contact MATTHEWS on February 8, 2017.  The Alexandria Police Department ("APD")
obtained MATTHEWS' call detail records and historical cell site information during the course
of their investigation into MATTHEWS.

23.     A review of this information, reveals that MATTHEWS' known cellular phone
was in the area of a shooting incident on March 7, 2017.  Further, a review of the historical cell
site information reveals that MATTHEWS was not otherwise normally located in this area.

6

More specifically, MATTHEWS is only in the area of the shooting incident 5% of the time his phone is accessing a cell tower.

24.     On March 7, 2017, at approximately 6:30 pm, APD personnel responded to 4200 Duke Street.  At the scene, APD officers found a victim with a gunshot wound to his hip.  APD officers recovered seventeen (17) shell casings from the scene of the shooting.  APD officers also recovered a Glock 17 9mm pistol in the area of the shooting.  This firearm is currently being tested at the Commonwealth of Virginia Department of Forensic Science to determine whether it is the same weapon that fired the round that wounded the victim.

25.     Further investigation revealed the identity of the purchaser of the Glock 17 9mm pistol.  More specifically, the purchaser bought the firearm from Pawnbrokers of Alexandria on October 13, 2013.  A review of a Virginia State Police Firearms Gun Log search revealed that the purchaser bought another firearm on March 8, 2017, from Pawnbrokers of Alexandria, which is just one day after the shooting.

26.     Further, a review of the purchaser's phone records reveals that the purchaser's phone was in communication with MATTHEWS' phone a few hours prior to the shooting on March 7, 2017, and then again the next day.  Moreover, a review of historical cell site information reveals that MATTHEWS' phone was in the area of PawnBrokers of Alexandria on March 8, 2017, just a few hours after MATTHEWS' phone and the purchasers' phone were in communication.

C.     Bryan Jamal Matthews Possession of Marijuana at the PREMISES

27.     On March 2, 2017, APD Officers were dispatched to the PREMISES because a "strong odor of marijuana" was detected emanating from the PREMISES.  APD Officers

7

knocked on the front door of the PREMISES and contacted MATTHEWS. Because APD

officers observed marijuana in plain view and detected the odor of marijuana, APD Officers

obtained a search warrant for the residence. APD Officers searched the residence and seized a

small bag of suspected marijuana from a trash can in MATTHEWS' bedroom. MATTHEWS

was arrested for possession of marijuana.

       D.     <u>Bryan Jamal Matthews Distribution of Marijuana at the PREMISES</u>

      28.     MATTHEWS is currently out on bond for his pending charges in Fairfax County.

      29.     Between April 2017 and May 12, 2017, APD personnel conducted two (2)

controlled purchases of marijuana from MATTHEWS at the PREMISES.

      30.     In early April 2017, APD Detectives met with a cooperating informant ("CI-2").

CI-2 is cooperation because CI-2 hopes not to be charged with a minor possession of marijuana

offense. CI-2 informed APD Detectives that they purchased marijuana from a person named

"Lil B" and Bryan in the past. CI-2 further stated that MATTHEWS was then currently engaged

in selling marijuana. APD Detectives showed a picture of MATTHEWS to CI-2. CI-2

positively identified the person in the photograph as the person they knew to be MATTHEWS.

      31.     During the fourth week of April 2017, CI-2, at the direction of law enforcement,

contacted MATTHEWS to arrange the purchase of marijuana. APD Detectives monitored a

phone call between CI-2 and MATTHEWS. During this call, CI-2 requested to purchase a

quantity of marijuana. MATTHEWS agreed to sell the marijuana.

      32.     Prior to the controlled buy, CI-2 was searched and found to be free of any

contraband and money. CI-2 was provided money from the Vice/Narcotics special

investigations funds to purchase the marijuana. CI-2 was then monitored by APD Detectives

during CI-2's meeting with MATTHEWS at the PREMISES. After the meeting, CI-2 reported directly back to APD Detectives. CI-2 provided detectives a plastic bag, which contained a green leafy substance with a texture, color, and odor consistent with marijuana. CI-2 was searched and found to be free of any contraband and money. APD Detectives showed CI-2 a picture of MATTHEWS and CI-2 identified MATTHEWS as the person who just sold them the marijuana.

33.    On May 12, 2017, APD Detectives directed CI-2 to make a second controlled purchase of marijuana from MATTHEWS. Prior to the operation, CI-2 was searched and found to be free of any contraband and money. CI-2 was then provided money from the Vice/Narcotics special investigations funds to purchase the marijuana. CI-2 was then monitored by APD Detectives during CI-2's meeting with MATTHEWS at the PREMISES.

34.    Surveillance was maintained on the PREMISES during transaction. APD personnel observed MATTHEWS walking out of the PREMISES after CI-2 called MATTHEWS to tell MATTHEWS he had arrived. MATTHEWS was then observed reentering the PREMISES after the transaction was completed.

35.    After the meeting, CI-2 reported directly back to APD Detectives. CI-2 provided APD Detectives with a clear plastic bag, which contained a green leafy substance with a texture, color, and odor consistent with marijuana. CI-1 was searched and found to be free of any contraband and money. APD Detectives showed CI-2 a picture of MATTHEWS and CI-2 identified MATTHEWS as the person who just sold them the marijuana.

36.    APD Detectives field tested a portion of the substance from both controlled buys, which yielded a positive result for marijuana.

9

37.     Based upon the fact that law enforcement searched the PREMISES in March and seized marijuana; that MATTHEWS has sold marijuana twice from the PREMISES and most recently on May 12, 2017; and, that MATTHEWS has recently used and carried a firearm during a controlled purchase and appears to have been recently involved in a purchase of a firearm, I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and to seize the items described in Attachment B.

## TECHNICAL TERMS

38.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   *IP Address*:  The Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

b.   *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international

10

borders, even when the devices communicating with each other are in the same state.

   c. *Storage medium*: A storage medium is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

39.    As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

40.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file

11

on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

41.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when.  There is probable

12

cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of

13

session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a

14

digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

42.  *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the

16

warrant can take weeks or months, depending on the volume of data stored, and
would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways,
featuring a variety of different operating systems, application software, and
configurations.  Therefore, searching them sometimes requires tools or knowledge
that might not be present on the search site.  The vast array of computer hardware
and software available makes it difficult to know before a search what tools or
knowledge will be required to analyze the system and its data on the Premises.
However, taking the storage media off-site and reviewing it in a controlled
environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be
stored in a variety of storage media formats that may require off-site reviewing
with specialized forensic tools.

43.  *Nature of examination.*  Based on the foregoing, and consistent with Rule
41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying
storage media that reasonably appear to contain some or all of the evidence described in the
warrant, and would authorize a later review of the media or information consistent with the
warrant. The later review may require techniques, including but not limited to computer-assisted
scans of the entire medium, that might expose many parts of a hard drive to human inspection in
order to determine whether it is evidence described by the warrant.

44.  Because several people share the PREMISES as a residence, it is possible that the
PREMISES will contain storage media that are predominantly used, and perhaps owned, by

17

persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that

the things described in this warrant could be found on any of those computers or storage media,

the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

45.  Based on the foregoing facts, there is probable cause to believe that BRYAN

JAMAL MATTHEWS is involved in the following federal offense: (i) conspiracy to distribute

and to possess with intent to distribute marijuana, in violation of Title 21, United States Code,

Sections 841(a)(1) and 846 and (ii) carry and use of a firearm during a drug trafficking crime, in

violation of Title 18, United States Code, Section 924(c).  In addition, there is probable cause to

believe that items and records that are evidence of these violations are currently contained in the

PREMISES known as 220 Century Place, Apartment 3208, Alexandria, Virginia 22304.  I

submit that this affidavit therefore supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.


Jonathan F. Earle
Special Agent
Bureau of Alcohol, Tobacco, Firearms, and
Explosives

Subscribed and sworn to before me this _____ day of May, 2017.


_____/s/_____
John F. Anderson
The Honorable John F. Anderson
United States Magistrate Judge

18

## ATTACHMENT A

*Property to be searched*

The property to be searched is 220 Century Place, Apartment 3208, Alexandria, Virginia 22304 (the "PREMISES"). The PREMISES is apartment located in a red brick and gray siding with white trim multi-level apartment building at "The Point" apartment complex. The front entrance doors are two blue glass double doors with 220 displayed above them in white letters. The PREMISES is located on the second floor of this multi-level apartment building. The apartment door is dark blue with a silver door handle. The number "3208" is attached to a placard in the center of the door in white lettering. In addition, the search shall be extended to any locked safe or container within the PREMISES.



## ATTACHMENT B

*Property to be seized*

a)      The items to be seized are fruits, evidence, records and information relating to,

contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1)

and 846(a) (distribution and possession with intent to marijuana and other controlled substances,

and conspiracy to distribute marijuana and other controlled substances) and Title 18, United

States Code, Section 924(c) (carry and use of a firearm during and relation to a drug trafficking

crime), including, but not limited to:

a)  Illegal narcotics and drugs, in particular marijuana, a Schedule I controlled

substance, and Xanex pills, a Schedule IV controlled substance;

b)  Firearms, magazines, and ammunition;

c)  Receipts documenting the purchase of firearms, magazines, and ammunition;

d)  United States currency derived from the sale of controlled substances;

e)  Money ledgers, and other documents noting the price, quantity, date and/or times

when controlled substances were purchased, possessed, transferred, distributed,

sold or concealed, or money was possessed or transferred;

f)  Bank statements and records, which might reflect the proceeds generated from the

sale of controlled substances;

g)  Indicia of control, or ownership of the premises and things described in this

warrant, such as utility bills, telephone bills, loan payment receipts, canceled

envelopes and keys, photographs, and bank records;

20

h)   Cellular phones, computers, and other electronic storage media or digital devices;

i)   For any electronics searched, any conversations, whether through text messages or other applications, where MATTHEWS discusses the purchase and sale of marijuana and other controlled substances;

j)   For any electronics searched, any conversations, whether through text messages or other applications, where MATTHEWS discusses the purchase and use of firearms; and

k)   For any electronics searched, any photographs of controlled substances, firearms, ammunition, firearms receipts, and documentation related to the purchase of firearms.

b)   For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a)   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b)   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

21

c) evidence of the lack of such malicious software;

d) evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e) evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f) evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g) evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h) evidence of the times the COMPUTER was used;

i) passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j) documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k) records of or information about Internet Protocol addresses used by the COMPUTER;

l) records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m) contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

23

# ATTACHMENT A

*Property to be searched*

The property to be searched is 220 Century Place, Apartment 3208, Alexandria, Virginia 22304 (the "PREMISES"). The PREMISES is apartment located in a red brick and gray siding with white trim multi-level apartment building at "The Point" apartment complex. The front entrance doors are two blue glass double doors with 220 displayed above them in white letters. The PREMISES is located on the second floor of this multi-level apartment building. The apartment door is dark blue with a silver door handle. The number "3208" is attached to a placard in the center of the door in white lettering. In addition, the search shall be extended to any locked safe or container within the PREMISES.



## ATTACHMENT B

*Property to be seized*

a)      The items to be seized are fruits, evidence, records and information relating to, contraband, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846(a) (distribution and possession with intent to marijuana and other controlled substances, and conspiracy to distribute marijuana and other controlled substances) and Title 18, United States Code, Section 924(c) (carry and use of a firearm during and relation to a drug trafficking crime), including, but not limited to:

a)   Illegal narcotics and drugs, in particular marijuana, a Schedule I controlled substance, and Xanex pills, a Schedule IV controlled substance;

b)   Firearms, magazines, and ammunition;

c)   Receipts documenting the purchase of firearms, magazines, and ammunition;

d)   United States currency derived from the sale of controlled substances;

e)   Money ledgers, and other documents noting the price, quantity, date and/or times when controlled substances were purchased, possessed, transferred, distributed, sold or concealed, or money was possessed or transferred;

f)   Bank statements and records, which might reflect the proceeds generated from the sale of controlled substances;

g)   Indicia of control, or ownership of the premises and things described in this warrant, such as utility bills, telephone bills, loan payment receipts, canceled envelopes and keys, photographs, and bank records;

h)   Cellular phones, computers, and other electronic storage media or digital devices;

2

i)  For any electronics searched, any conversations, whether through text messages or other applications, where MATTHEWS discusses the purchase and sale of marijuana and other controlled substances;

j)  For any electronics searched, any conversations, whether through text messages or other applications, where MATTHEWS discusses the purchase and use of firearms; and

k)  For any electronics searched, any photographs of controlled substances, firearms, ammunition, firearms receipts, and documentation related to the purchase of firearms.

b)  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a)  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b)  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c)  evidence of the lack of such malicious software;

3

d)  evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e)  evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f)  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g)  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h)  evidence of the times the COMPUTER was used;

i)  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j)  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k)  records of or information about Internet Protocol addresses used by the COMPUTER;

l)  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m) contextual information necessary to understand the evidence described in this attachment.

4

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, including "smart" phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.